JOURNAL ENTRY AND OPINION
Defendant-appellant William McAlphine appeals from his jury trial conviction for one count of felonious assault (R.C. 2903.11[1]), a second-degree felony. For the reasons adduced below, we affirm.
A review of the record on appeal indicates that the offense in issue occurred on May 8, 2000. On that day, appellant admits that he struck the victim, Alkhidr Muhammed, with a piece of two-by-four lumber while the victim was on appellant's property. However, appellant claimed that, while he was arguing with his fiance (Linda Taylor), he acted in self-defense after being attacked by the victim and Kirtsen Lyons (the victim's brother) who had interceded in the argument because the victim and Lyons did not condone the manner in which Ms. Taylor was being spoken to. Appellant claimed that Lyons was armed with a tile knife and had threatened appellant with the weapon.
The testimony at trial was generally in line with the opposite positions taken by the parties. The victim testified for the state that his house is next door to the Taylor house and that, while he was inside his house, he heard through an open window the appellant arguing loudly with Taylor. The victim went outside and asked his brother (Lyons, who lived with the victim at the time and who was loading materials into a station wagon vehicle), what was going on. According to the victim, Lyons answered that the appellant was arguing with Taylor and that Lyons had told the appellant to "take the foolishness inside." Tr. 81. The victim then bade his brother good-bye, at which point Taylor exited her home to leave in her car. As Taylor was leaving, the appellant was cursing at Taylor from the back porch doorway. The appellant then asked the victim "what's up?" Tr. 83. The victim responded, "what's up with you?" Id. The appellant replied, "fuck you, motherfucker," went inside the porch for a second and returned with "pipe or something" and swung it at the victim. Tr. 84-85. The next thing the victim remembered was being transported to the hospital by emergency personnel. The victim, who was fifty-one years old, weighed approximately 130 pounds, and was five-feet-six-inches tall, stated that he was struck in the head by what he believed was a piece of lumber and that for a period of four-to-six weeks thereafter he suffered from head and neck aches and impaired vision and missed work. The victim stated that he was unarmed and that he never saw Lyons pick up anything to use as a weapon. The victim was on Taylor's property when he collapsed after being struck by the appellant.
Lyons testified for the state that he was loading his station wagon and heard a loud argument emanating from Taylor's house. According to Lyons, the appellant opened a window and began directing profanities at Lyons. The appellant then closed the window and Lyons resumed his loading of the car. The appellant then appeared on the back porch, looked at Lyons, and asked Lyons "what the fuck you got to say?" Tr. 121. Lyons answered in disbelief, "what?" The appellant then threatened to beat Lyons. Lyons then instructed the appellant to take it "somewhere else." Tr. 122. At that point, the victim came outside to inquire as to what was going on. As Lyons was loading the car and speaking to the victim, Lyons observed Taylor leave her house in a "hasty manner." Tr. 125. The appellant followed her outside, cussing at her. As Lyons was seated in his car, he heard a loud crack. Lyons exited his car to find the appellant with a two-by-four piece of lumber in his hands. Tr. 127. The appellant swung the wooden weapon at Lyons, but missed. Lyons made a move to advance in the direction of the appellant, but fell down. As he fell, Lyons observed his unconscious brother lying on the ground in Taylor's back yard. As the appellant came at Lyons again, Lyons rolled, picked up something off the ground and went to his brother's aid. Lyons was not sure what he had picked up but believed it was most probably a piece of discarded metal flashing from the roofing construction debris on the ground, but may have been a can, a bottle, or piece of broken glass. Lyons was positive the weapon he picked up was not a knife. Lyons displayed the new-found weapon to the appellant and the appellant retreated. Lyons then took the victim back to his own house where the authorities were summoned. Lyons stated that he never raised his voice and said nothing to provoke the appellant.
Richard Schiffbauer testified for the state that he and his co-worker, Mark Dick, were both employed by a local roofing company at the time of the offense and were working on the roof of Taylor's house. After returning from lunch, Schiffbauer stated that he heard the appellant and Taylor arguing. Schiffbauer, who was working on the back porch, observed Taylor leave the house, and that the appellant followed on her heels, shouting profanities at the lady and calling her derogatory names. The witness then heard either the victim or Lyons tell the appellant that he shouldn't speak that way to a lady. The appellant then repeatedly asked this person whether he was talking to him (the appellant). The witness then observed the appellant, who was near the porch, pick up a concrete garden sculpture as the two brothers were leaning against Lyons' station wagon. He observed the appellant strike the victim with a two-by-four piece of lumber, swinging it with two hands like a baseball bat; the victim dropped instantly to the ground. The victim was at least a foot shorter than the appellant. Lyons then came over to assist the fallen brother and the appellant started to swing the piece of wood at Lyons, hitting Lyons in the process as Lyons attempted to defend himself. According to the witness, Lyons pulled out a tile knife after being hit by the appellant. The knife was described by the witness as being approximately eight inches in total length with a four-inch curved blade, and attempted to defend himself, but that the knife was never used because Lyons was struck before he could use the knife. Lyons recovered his brother and took him back to the victim's house. The witness stated that Taylor was gone from the scene when the appellant started swinging the lumber and that Lyons held the knife in his right hand.
William Hendricks, who lived in a home behind the Taylor house, testified for the state. Hendricks stated that he heard a commotion coming from the Taylor home so he went outside to investigate. Standing beside his backyard gate, he observed the appellant swinging a board in his hand and the victim lying on the ground, with Lyons trying to pick the victim up.
Cleveland Police Officer, Paul Marschall, testified for the state that he and his partner were dispatched to the victim's house at approximately 1:30 p.m. on the date of the offense. At the time they arrived, the victim was in the process of being transported to the hospital. The appellant had fled the scene by the time they arrived and the officers, because of the amount of roofing debris on the property grounds, could not locate the weapon used by the appellant.
The final witness for the state was Cleveland Police Detective Stephen McGraw, who stated that he was assigned the case to investigate. In his investigation, he could not find any person who witnessed the attack on the victim. Approximately a month after receiving the case file, he received a faxed communication from the appellant in which the writer told a story depicting the victim and Lyons as aggressors who, without provocation by the appellant, intervened in the appellant's argument with Taylor and threatened appellant with harm. See State's Exhibit 5. The appellant's fax also stated that Lyons had a knife and that appellant used the piece of lumber in self-defense after being confronted with the knife. Detective McGraw also stated that a two-by-four piece of lumber is capable of inflicting serious injury or death upon one struck with the instrument.
At that point the state rested and the court overruled a motion for acquittal and a renewed motion for a mistrial. Tr. 220.
The defense consisted of two witnesses. The first defense witness was Taylor, who stated that the appellant lived with her. She admitted that she and appellant had loud "words" at the time of the offense. She also stated that the victim had asked the appellant if the appellant had a problem with the victim, to which the appellant replied in the negative and that he was "talking to my woman." Tr. 223-224. With that, Taylor exited the scene and drove away, leaving appellant standing on the threshold of the porch door, the victim standing beside Lyons' station wagon, and Lyons seated in the station wagon. Taylor testified that the appellant, at a later time, told her his version of the events.
The second defense witness was Bennie Johnson, who stated that he was sitting on his porch, directly across the street from the Taylor house, at the time of the offense. While sitting, he observed the appellant come out of the house, talking loudly, saying that he was talking to his woman. He next observed the victim and Lyons approach the appellant and jump into Taylor's front yard. As they approached, the appellant picked up a piece of wood that was on the ground.[2] Tr. 245-246. The pair were on either side of the appellant and it "seemed like a confrontation was trying to get started." Tr. 243. Then a small argument broke out and appellant started to back up. The appellant lifted the wood up and the witness saw the victim fall backwards. Then, the witness saw appellant and Lyons fighting. Lyons punched the appellant in his stomach and the appellant bent over and retreated. Lyons then picked up something off the ground and chased the appellant for a short time before Lyons started to retreat. The witness testified on cross-examination that he did not see Taylor that day, did not see the victim being taken back to his house, did not see appellant strike anyone, did not see where appellant went after the fracas ended, and saw no police on the scene that day. Tr. 252, 255, 258, 264-265, 266. The witness was positive that no one had weapons when the event started, that appellant was the first to pick up a weapon after the brothers were on either side of him. Tr. 267-268. The witness also stated that Lyons picked up his weapon with his right hand, and hit the appellant after the victim was on the ground. Tr. 269.
At that point, the defense rested. Tr. 271. The parties next presented their closing arguments. Tr. 272-293. The court then instructed the jury as to the law to be applied. Tr. 293-306. The court then denied a motion by the defense that the jury be instructed on the lesser offense of aggravated assault pursuant to R.C. 2903.12. Tr. 306-307. Subsequent to the court answering a communication from the jury, a guilty verdict was reached. Tr. 307-308. On the next day, appellant was sentenced to a term of two years, the minimum term available pursuant to R.C. 2929.14(A)(2), with post-release control for an additional three-year period following his release from prison.
Appellant presents five assignments of error for review.
The first assignment of error provides:
I
 THE TRIAL COURT ABUSED ITS DISCRETION AND ACTED IN CONTRAVENTION OF THE WEIGHT OF THE EVIDENCE WHEN IT REFUSED TO INSTRUCT THE JURY AS TO THE LESSER INCLUDED OFFENSE OF AGGRAVATED ASSAULT, SINCE THE EVIDENCE DEMONSTRATED THAT APPELLANT WAS UNDER THE INFLUENCE OF A SUDDEN PASSION OR FIT OF RAGE, BROUGHT ON BY SERIOUS PROVOCATION BY THE VICTIM.
In analyzing this assignment we are guided by the following passage from another felonious assault case where a trial court similarly refused to instruct the jury on the lesser included offense of aggravated assault:
 In State v. Deem (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, we held that "aggravated assault" was an offense of an inferior degree of felonious assault because its elements were identical to felonious assault except for the additional mitigating element of provocation. Thus, we stated, "in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury." Id., paragraph four of the syllabus. Furthermore, "provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." Deem, at paragraph five of the syllabus. In that case, we found that a historically stormy relationship and the bumping of the offender's car by the victim's car were insufficient, as a matter of law, to incite the offender into using deadly force. Deem, 40 Ohio St. 3d at 211, 533 N.E.2d at 300. Since there was insufficient evidence of provocation, we held that "even though aggravated assault is an offense of an inferior degree to the indicted crime [of felonious assault], an instruction thereon was not supported by the evidence presented in this case, and was properly refused." Id.
 In State v. Shane (1992), 63 Ohio St.3d 630, 590 N.E.2d 272, we elaborated on what constitutes "reasonably sufficient" provocation in the context of voluntary manslaughter. First, an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. That is, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "actually was under the influence of sudden passion or in a sudden fit of rage." Shane, 63 Ohio St. 3d at 634-635, 590 N.E.2d at 276. We also held in Shane that words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations. Id., paragraph two of the syllabus.
State v. Mack (1998), 82 Ohio St.3d 198, 200-201.
Also, "verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." Id. at 201, citing State v. Huertas (1990), 51 Ohio St.3d 22, 31-32, 553 N.E.2d 1058,1068-1069, and State v. Pierce (1980), 64 Ohio St.2d 281, 18 Ohio Op. 3d 466, 414 N.E.2d 1038.
Giving the appellant's version of events the benefit of the doubt, we fail to see sufficient evidence of provocation. Taylor testified that the victim asked the appellant whether appellant had a problem with the victim. These words, interpreted as a verbal threat, do not constitute provocation because there was sufficient time for the appellant to cool off prior to picking up a weapon. That Lyons picked up a weapon cannot be perceived as an act which would provoke the appellant because, as testified to by Bennie Johnson, Lyons did not pick up a weapon untilafter appellant had picked up a weapon. If anything, Lyons' picking up a weapon was an act of self-defense on Lyons' part, in aid of his stricken brother, when confronted with an armed appellant who had just rendered the victim unconscious with a blow from the appellant's swinging lumber.
Absent the mitigating element of serious provocation, the trial court did not err in failing to instruct the jury on the lesser offense of aggravated assault.
The first assignment of error is overruled.
The second assignment of error provides:
II
 THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED APPELLANT HIS DUE PROCESS RIGHTS IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION, WHEN IT OVERRULED APPELLANT'S MOTION FOR A MISTRIAL DUE TO PRESENCE OF THE JURY DURING A HEATED DIALOGUE BETWEEN APPELLANT AND THE TRIAL JUDGE DURING WHICH THE JUDGE THREATENED TO GAG APPELLANT AND OTHERWISE DEMONSTRATED HOSTILITY TOWARD APPELLANT.
Immediately prior to the jury pool members being brought into the courtroom for the commencement of voir dire, appellant and the court engaged in a short colloquy concerning appellant's desire to obtain new counsel and continue the trial because appellant did not have faith in his trial counsel and wished to retain new counsel more to his liking.[3]
The appellant believed that he was being "railroaded," yet the court was satisfied with defense counsel and was intent on proceeding with the trial. The episode to which appellant refers in the stated assignment occurred immediately after this brief exchange, when the court brought those jury pool members into the courtroom for the commencement of voir dire. The episode in issue reflects the following exchange:
(Thereupon jury entered courtroom)
THE COURT: Please be seated.
 THE DEFENDANT: No. I'm not being railroaded. I'm not sitting.
 THE COURT: We're proceeding with the trial and you can do it any way you want.
 THE DEFENDANT: I'm supposed to have my rights where I can have counsel that I want. Counsel is not representing me properly. I asked you [obviously referring to the trial judge] nicely could I have time to get counsel. You all want to railroad me without getting a chance to get counsel. I've been here seven months in County jail waiting to go to trial. I never asked for a continuance. They got a visiting Judge [referring to the trial judge who was a visiting jurist assigned to hear the present case]. He [appellant obviously is speaking to the potential jury and is referring to the trial judge] said I can't have time enough to hire counsel. That's not right. So, that means I got to put my life on the line with a guy that I don't have —
 MR. REGAS [the assistant county prosecutor representing the state]: Your Honor, I object to any statements being made by the Defendant in front of the jury at this time.
THE DEFENDANT: Whatever.
THE COURT: Mr. McAlphine?
 THE DEFENDANT: I'm not sitting down and you're railroading me. I need a lawyer. This man ain't for me.
 THE COURT: You're about to be gagged. If you want that, we can proceed that way.
 THE DEFENDANT: I won't be gagged. I want out of here.
 THE COURT: Ladies and gentlemen, we're here for the trial today of the case of the State of Ohio versus William McAlphine. This is a charge of felonious assault. And, the Court and counsel may have questions to place to you concerning your qualifications to be jurors in this case. And, before we do that, I'm going to ask you to please all rise and take the oath.
(Jury sworn for purposes of voir dire)
Tr. 9-10 [explanatory notes added in brackets].
At the conclusion of the evidence, the trial court, as part of its general charge to the jury, issued a curative instruction relative to any perceived bias by the court:
 If, during the course of the trial, the Court said or did anything you consider an indication of my view on the case, you're instructed to disregard it during your deliberations. The case is yours to decide. (Tr. 304.)
Appellant argues on appeal that the trial judge's admonition in the presence of the potential jury members, that appellant was "about to be gagged," conveyed a bias by the trial judge to the jury which prejudiced the defense in the eyes of the jury.
The authority of a trial court to control a disruptive criminal defendant, the decision to grant or deny a mistrial based on disruptive conduct by a defendant, and the decision of an appellate court to apply the doctrine of invited error so as to deny relief in such matters, were recently discussed in State v. Chambers(Jul. 13, 2000), Franklin App. No. 99AP-1308, unreported, 2000 Ohio App. LEXIS 3104 at 10-11, 12-15:
 Further, a judge is at all times during the sessions of the court, empowered to maintain decorum and enforce reasonable rules to insure the orderly and judicious disposition of the court's business. State v. Clifford(1954), 162 Ohio St. 370, 372, 123 N.E.2d 8. The United States Supreme Court has stated "we believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." Allen, 397 U.S. at 343, 90 S.Ct. at 1061. The court indicated that in the case of particularly obstreperous defendants, it is permissible for the court to: (1) bind and gag the defendant; (2) cite the defendant for contempt; or (3) remove the defendant from the courtroom. 397 U.S. at 343-344, 90 S.Ct. at 1061.
* * *
 The decision to grant or deny a motion for mistrial rests within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, 182, 510 N.E.2d 343. This is because the trial court is in the best position to determine whether a mistrial is needed. State v. Glover (1988), 35 Ohio St.3d 18, 19, 517 N.E.2d 900. In order to demonstrate that a trial court has abused its discretion in denying a motion for a mistrial, a defendant must show that the trial court's decision was arbitrary, unreasonable, or unconscionable. State v. Nichols (1993), 85 Ohio App.3d 65, 69, 619 N.E.2d 80. A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused are adversely affected. Id. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." State v. Franklin (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1.
 Appellant seeks to take advantage of an error, which he himself induced. It is well established that a court will not permit a party to take advantage of such "invited error." Under the invited error doctrine, a party may not take advantage of an alleged error that the party induced or invited the trial court to make. State ex rel. Fowler v. Smith (1994), 68 Ohio St.3d 357, 359, 626 N.E.2d 950; Rhodes v. Rhodes Industries, Inc. (1991), 71 Ohio App.3d 797, 806, 595 N.E.2d 441. "[A] litigant cannot be permitted, either intentionally or unintentionally to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible." Lester v. Leuck (1943), 142 Ohio St. 91, 93, 50 N.E.2d 145. Further, courts have been reluctant to consider the disruptive conduct of a defendant to be a proper ground for a mistrial. See State v. James, 1999 Ohio App. LEXIS 506 (Feb. 19, 1999), Clark App. No. 98-CA-54, unreported (outburst by defendant during voir dire insufficient to declare mistrial); State v. Gonzalez, 1998 Ohio App. LEXIS 5510 (Nov. 18, 1998), Athens App. No. 97CA52, unreported (outbursts and interruptions, made both in and out of jury's presence, insufficient to declare mistrial). "To hold that the disruptive conduct of a defendant is a proper ground for a mistrial, it has been said, would provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so." James, supra, citing cases at Annotation, Disruptive Conduct of Accused (1979), 89 A.L.R.3d 960 (in presence of jury as ground for mistrial or discharge of jury). In the present case, appellant cannot participate in numerous, intentional, disruptive acts and then seek the protection of the court from his own misbehavior. Further, we note that the trial court twice admonished the jury to disregard the behavior of appellant and not allow it to affect their deliberations on the present case. A jury is presumed to follow instructions of the court and to obey curative instructions. State v. Loza (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082; Franklin, supra, at 127. Therefore, appellant's second assignment of error is overruled.
Also see Illinois v. Allen (1970), 397 U.S. 337, 90 S.Ct. 1057,25 L.Ed.2d 353.
Assuming that the jury heard the redacted conversation between the appellant and the court prior to voir dire, we cannot conclude that the trial court abused its discretion in failing to grant a mistrial as a result of appellant's outbursts before the potential jury and the court's admonition that it would order the appellant be gagged should he persist in his disruptive behavior. Our conclusion is premised on the doctrine of invited error. Also, we note that the trial court made a curative instruction so as to purge any bias exhibited by the court. It is presumed that the jury followed this instruction. Finally, we also note that each of the jurors who were selected from the pool of potential jurors, while being questioned during voir dire, stated that he/she could be impartial and decide the case on the evidence presented. There is no indication that the jurors answered their voir dire questions untruthfully or were negatively influenced by the court's attempt to control the disruptive appellant.
The second assignment of error is overruled.
The third assignment of error provides:
III
 APPELLANT'S RIGHT TO A FAIR TRIAL, GUARANTEED BY THE DUE PROCESS PROVISIONS OF ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE MISCONDUCT OF THE PROSECUTOR DURING CLOSING ARGUMENT AND THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO TAKE CORRECTIVE MEASURES WHEN THE PROSECUTOR INTRODUCED FACTS NOT IN EVIDENCE AND DEFENSE COUNSEL LODGED A TIMELY OBJECTION.
In this assignment appellant argues that, during closing argument, the prosecutor improperly commented upon a fact which was not in evidence. The alleged fact not in evidence was that Lyons was unable to use his right arm:
 Then he [appellant] tells us Mr. Lyons is gesturing like this and then Mr. Lyons picked something up with his right arm.
 You saw Mr. Lyons come out here. Mr. Lyons can't use his right arm in this matter.
MR. McGANN: Objection.
THE COURT: Overruled. These are arguments.
 MR. REGAS: He can't use his right arm in this matter. You saw him on the stand for a while. He came down here. He articulated. When he talked, his right arm didn't move. Unfortunately, it doesn't move. He can't move it. He's embarrassed by it. (Tr. 276-277.)
During his direct examination testimony, Lyons testified concerning the disability affecting his right arm, stating that he had "very little" range of motion or use of the right arm due to an industrial accident:
 Q. Can you describe your disability for us, sir?
 A. In 1970, I was, my arm was caught in a slitter machine and it was almost ripped off. But, it wasn't, I was about eighteen years old.
Q. Which arm, sir?
A. My right arm.
 Q. Do you have any range of motion or use of that arm?
 A. Very little. I hold it like this a lot so I can move it and so, that's how I exercise it. And, I put things in like, that you can hold, my glasses, I can hold paper in it, you know, so people don't know that I am disabled. It's not, that's something I've been doing. I was about eighteen years old, still in high school when I got hurt. And so, I don't like people that — it's not that I don't like or ashamed of —
MR. McGANN: Objection.
THE COURT: You may answer.
 A. (Continuing) But, when I was younger, I didn't want to be singled out as a cripple or disabled person, so it was something, a habit that I formed. (Tr. 137-138.)
The prosecutor's remarks in closing argument were reasonably based on the direct examination testimony of Lyons in which Lyons described the extent of his right arm's disability. It is clear from Lyons' testimony that his right arm had "very little" range of motion or use, that he felt some measure of embarrassment over the disability, and he made an effort to disguise the disability from average view by placing light, insubstantial objects in his impaired right hand. The prosecutor's remarks, that Lyons' "can't use his right arm" is not entirely accurate, hence improper, because Lyons can place small, light objects in his hand and Lyons does have mobility, albeit limited, with the right arm. However, in order to find prosecutorial misconduct, there must be (1) a determination that the remarks were improper and (2) that the improper remarks prejudiced the substantial rights of the accused. State v. Lott
(1991), 51 Ohio St.3d 160. In light of there being no demonstration of provocation, all witnesses with first-hand knowledge concurred that appellant was the first to pick up a weapon and use it, and Lyons ability to use his right arm was largely limited, we find harmless error in that we can attribute no prejudice from the prosecutor's remarks.
The third assignment of error is overruled.
The fourth assignment of error provides:
IV
 THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER CRIMINAL RULE 29.
The record indicates that the defense made a motion for acquittal pursuant to Crim.R. 29 at the close of the state's case-in-chief. This motion for acquittal was not renewed at the close of all the evidence. "A defendant waives any assertion of error if the defendant fails to renew the Crim.R. 29 motion after presenting evidence in his defense." Statev. Metz (Jul. 6, 2000), Cuyahoga App. No. 76298, unreported, 2000 Ohio App. LEXIS 3019 at 5, citing State v. Miley (1996), 114 Ohio App.3d 738,684 N.E.2d 102. Because appellant did not renew his Crim.R. 29(A) motion at the close of all evidence, he has waived any error in the denial of the motion.
The fourth assignment of error is overruled.
The fifth, and final, assignment of error provides:
V
 APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
This court in Metz, supra, 2000 Ohio App. LEXIS 3019 at 6, set forth the standard of review for an assignment arguing manifest weight of the evidence in a criminal case:
 To determine whether a conviction is against the manifest weight of the evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
 State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
In the present case, it is uncontroverted that appellant used a board as a weapon, that there was testimony that the board was capable of inflicting serious injury or death, and that the victim did suffer a serious injury to his head by the appellant's blow. After applying the above-mentioned standard of review, we cannot conclude that the verdict was against the manifest weight of the evidence.
The fifth assignment of error is overruled.
Judgement affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, A. J., and TERRENCE O'DONNELL, J., CONCUR.
[1] R.C. 2903.11, felonious assault, provides in pertinent part the following:
(A) No person shall knowingly:
(1) Cause serious physical harm to another * * *;
 (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *, as defined in section 2923.11 of the Revised Code. * * *
R.C. 2923.11(A) defines deadly weapon as follows:
 (A) "Deadly weapon" means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon.
[2] Several courts have previously found that a board alone can be a deadly weapon. See, State v. Ziernicki (Nov. 2, 1995), Cuyahoga App. No. 68614, unreported, 1995 Ohio App. LEXIS 4883 (victim struck on his head with a board causing serious laceration); State v. Williams (June 8, 1989), Cuyahoga App. No. 55490, unreported, 1989 Ohio App. LEXIS 2248 (victim struck repeatedly about his head and body with a two-by-four causing bleeding); State v. Bowling (June 13, 1984), Hamilton App. No. C-830739, unreported, 1984 Ohio App. LEXIS 9739; State v. Gordon (Feb. 14, 1979), Hamilton App. No. C-780107, unreported, 1979 Ohio App. LEXIS 9245.
[3] Appellant's assigned trial counsel was attorney Regis McGann, a criminal defense attorney for many years who, before entering private practice, had been employed for a number of years as an assistant county prosecutor in Cuyahoga County.